UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
NASHAAT MOZA,

                         Plaintiff,

            -against-

NEW YORK CITY HEALTH AND HOSPITALS
CORPORATION, KINGS COUNTY HOSPITAL
CENTER, ROBERT BERDING, and NATALIE WOLL,

                         Defendants.
-----------------------------------------------------------------------X

COMPLAINT

Civ. Action No.:

Jury Trial Demanded

Plaintiff, Nashaat Moza ("Plaintiff") by and through his attorneys, FRANK & ASSOCIATES, P.C., brings this action against Defendants New York City Health and Hospitals Corporation ("HHC"), Kings County Hospital Center ("KCHC"), Robert Berding ("Berding") individually, and Natalie Woll ("Woll"), individually, (collectively "Defendants"), and respectfully alleges, as follows:

## INTRODUCTION

1.      Plaintiff brings this action pursuant to 42 U.S.C. §1983 to remedy discrimination in employment on the basis of race, ethnicity and national origin in violation of Section 1981 of the Civil Rights Act of 1866, as amended, 42 U.S.C. §1981 and the Administrative Code of the City of New York §8-107 et seq. Plaintiff seeks injunctive and declaratory relief, compensatory, punitive damages and other appropriate legal and equitable relief pursuant to Section 1981 and the Administrative Code.

## JURISDICTION

2.      This Court has jurisdiction over Federal Law claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over city law claims pursuant to 28 U.S.C. § 1367.

3.      This action properly lies within the United States District Court for the Eastern District of New York, pursuant to 28 U.S.C. § 1391 because Plaintiff resides in the County of Kings, New York.

## PARTIES

4.      Plaintiff is a resident and domiciliary of the County of Kings, State of New York, residing at 7504 10th Avenue, Brooklyn, New York.

5.      At all times relevant to the Complaint, Plaintiff was a "person" within the meaning of NYCHRL § 8-102(1).

6.      Defendant HHC is a public benefit corporation created in 1969 by the New York State Legislature, which has operated and continues to operate all of the public hospitals and clinics in New York City, including but not limited to KCHC.

7.      Defendant KCHC is a hospital providing emergency and non-emergency healthcare services and ambulatory care services to residents of Brooklyn, New York and Staten Island, New York.

8.      Collectively, Defendants HHC and KCHC are joint employers of Plaintiff.

9.      Defendants HHC and KCHC are "employers" as defined by NYCHRL § 8-107(5).

10.     At all times relevant to the Complaint, Defendant Natalie Woll was the Senior Associate Director of Risk Management.

11.     At all times relevant to the Complaint, Defendant Robert Berding was Associate Executive Director of Regulatory Affairs and Risk Management of KCHC.

## FACTUAL ALLEGATIONS

12.     Plaintiff was born on June 28, 1952 and is 62 years old.

2

13.     Plaintiff is Egyptian, and speaks with a distinct Middle Eastern accent.

14.     Plaintiff received a Medical Degree in 1976 from Assuit University, in Assuit, Egypt, a Master's Degree in General Surgery in 1984 from the Cairo University School of Medicine, in Cairo, Egypt, and a Doctorate Degree in General Surgery in 2000 from the Cairo University School of Medicine. Plaintiff is not licensed to practice medicine in New York State.

15.     On or about September 2, 2008, Defendant KCHC hired Plaintiff as Assistant Director of Risk Management.

16.     The clinical section of the Risk Management Department was comprised of Plaintiff and three other employees: Dr. Patrick Belhomme, Dr. Lany Pierre, and Mr. Sean Lewis, all of whom performed duties similar to Plaintiff's duties.

17.     Upon information and belief, Dr. Belhomme is 52 years old, Dr. Pierre is 45 years old and Mr. Lewis is 27 years old. All are of Haitian descent.

18.     From January 2011 through March 2013 Plaintiff reported directly to Dr. Isabel McFarlane, whom was the Senior Associate Director of Risk Management and the Supervisor of the Risk Management Department.

19.     Throughout the course of Plaintiff's employment with Defendants, Plaintiff performed his job duties excellently and without criticism or discipline, as evidenced by the annual performance ratings he received from 2009 through 2012:

- 10/2009:   E – "Exceeds Expectations";
- 11/2009:   C – "Fully Competent";
- 2010:      C – "Fully Competent";
- 2011:      S – "Superior";
- 2012:      E – "Exceeds Expectations".

20.     In March 2013, Dr. McFarlane was transferred to a different department.

21.     On and about February 21, 2013, Dr. McFarlane asked Plaintiff to sign a blank performance evaluation form, post-dated to February 28, 2013.  Plaintiff complied.

22.     On or about the beginning of March 2013, Defendants hired Natalie Woll, who replaced Dr. McFarlane as Plaintiff's supervisor

23.     Upon information and belief, Woll is approximately 15 years younger than Plaintiff and is of Russian descent.

24.     Woll began harassing Plaintiff almost immediately after she became his supervisor.

25.     Woll mistakenly blamed Plaintiff for an alleged mistake in March, 2013 during the electronic submission of a case to the NYSDOH (New York State Department of Health.) Woll did not retract her improper criticism.

26.     On or about April 3, 2013:

- Berding stated to Plaintiff that Dr. McFarlane had given him a "poor" performance evaluation rating of NI – "Needs Improvement."

- Berding refused to provide Plaintiff a copy of the alleged performance evaluation and told Plaintiff that he did not have a complete evaluation at the time.

- Berding dismissed Plaintiff's concerns regarding his job security and assured Plaintiff he would receive his "real" annual performance evaluation in June.

- Berding refused to allow Plaintiff to write a rebuttal regarding the alleged performance evaluation.

- The following day, Plaintiff reiterated his job security concerns to Berding via e-mail. Berding failed to reply.

4

27.     Plaintiff had been assigned specific duties during meetings, which included but were not limited to: identifying the standard of care issues after reviewing a case, making recommendations to improve patient care, preparing the minutes subsequently submitted to the Medical Director, meeting Chair, and the Department of Regulatory Affairs, and which were used to create Root Cause Analyses.

- On or about April 8, 2013, Woll severely criticized Plaintiff for talking too much during meetings and sitting too close to the meeting Chair.

- Plaintiff sat next to the meeting Chair to ensure he could accurately hear all meeting participants speak in order to take complete and accurate minutes and to make sure that he did not miss any conversation. He would also talk during the meetings to point out "standard of care" issues which he had identified during his review of each case, and to make suggestions how to prevent the identical issues from re-occurring.

- Woll demanded Plaintiff sit at the back of the room with the other Risk Management employees and refrain from describing issues with patient care.

28.     Woll and Berding continually created tension between Plaintiff and his Haitian Risk Management co-workers:

- They repeatedly told Plaintiff his co-workers did not like him.

- Woll falsely claimed Plaintiff refused to work as a team with his co-workers. When in fact, on many occasions Woll witnessed Plaintiff working alongside with his co-workers.

- Woll berated Plaintiff for assisting and providing guidance to his co-workers, stating "We don't need your enrichment, Dr. Moza."

29.     Woll continually criticized Plaintiff for deficiencies in his write-ups, while overlooking deficiencies of his co-workers. Woll would cross out the reports written by Plaintiff and on many occasions unnecessarily rewrote them completely. However, she did not revise the write ups of Plaintiff's co-workers for deficiencies.

30.     During a meeting on April 11, 2013 Woll, Berding, Michele Welcome (Associate Director of Risk Management) and Human Resources representatives Michelle Emmons and Patricia Murray, Woll and Berding claimed that Plaintiff had "performance issues, Plaintiff was criticized for talking too much during meetings, and for sitting close to the meeting Chair.

31.     During the same meeting, Woll and Berding made a comment about Plaintiff's co-workers having "issues" with Plaintiff, but refused to discuss the nature of any alleged issues or identify which employees allegedly complained.

32.     During the same meeting, Woll demeaned the Plaintiff by telling him that his coworkers were smarter than him. Woll demeaned Plaintiff by stating that Plaintiff in the Risk Management Department "makes himself look as if he is an important person", and pointed out that Plaintiff was not an important person in the Department.

33.     On or about April 12, 2013, Woll removed Plaintiff from the office he shared with Mr. Lewis and Dr. Belhomme and moved Dr. Pierre into Plaintiff's office.

34.     On or about April 15, 2013, after working with the plaintiff for only one month, Woll began her intense campaign to terminate Plaintiff. Woll placed Plaintiff on an informal Performance Improvement Plan (PIP), which was demeaning, unwarranted, and did not reflect Plaintiff's performance.  The PIP required Plaintiff to:

- forward all incoming calls to Woll instead of his previous custom of handling calls himself;

- involve other Risk Management employees in all of his assigned cases;

- maintain a daily log of every task he performed and the time that he took to complete each task and E mail it to her at the end of each day;

- provide Woll with a list of "special projects" for which he was responsible;

- cease any contact with NYPORTS representatives;

- obtain approval from Woll for all of his work product;

- contact Woll via phone or in person only in the case of a "major or urgent situation" and otherwise contact her only via email; and

- have all of his work checked multiple times for grammatical errors, spelling errors, and "logical flow."

- Woll did not require any other Risk Management employees to provide any such information.

- Woll further reassigned many of Plaintiff's duties to other Risk Management employees.

35.     Following the PIP, Woll continually reviewed Plaintiff's reports and made extensive edits to them, often removing clinically significant data, thus requiring Plaintiff to explain the importance of the data to so she would permit him to resolve her objections.

36.     Woll frequently and improperly criticized Plaintiff for errors made by the Department Secretary.

37.     In May, 2013, the Department Secretary went on Leave of Absence. During her leave, Plaintiff alone was assigned the Secretary's clerical duties, which included:

- retrieving reports from the Nursing Office, stamping them, and giving them to Dr. Pierre to code, then submitting them electronically to the HHC Risk Management web site;

- assisting Dawn McKenzie in carrying patients' records to and from the Medical Records Department; and

- assisting Dawn McKenzie in retrieving documents from the Radiology Department.

38.   In or around the beginning of July 2013, Mr. Berding left his position as Associate Executive Director of Risk Management and was replaced by Dr. Ghassan Jamaleddine.

39.   On or about July 9, 2013, Woll berated and humiliated Plaintiff in the presence of the other Risk Management employees, allegedly because he had not timely reviewed his co-worker's work product which was not one of his responsibilities.

40.   On or about July 18, 2013, Plaintiff attended an RCA meeting with Woll, his Risk Management co-workers, Dr. McFarlane, and several other doctors and nurses, during which Woll mistakenly berated Plaintiff for two allegedly deficient case write ups when Plaintiff advised Woll the write-ups had actually been authored by Dr. Pierre and Mr. Lewis, Woll refused to criticize Pierre and Lewis or apologize to Plaintiff and dropped the subject.

41.   On or about July 23, 2013, Woll gave Plaintiff a performance rating of U – "Unsatisfactory". Woll told Plaintiff that he was not diplomatic and was the worst person in the department. The performance evaluation was replete with false statements and unwarranted criticism of Plaintiff's performance. Woll gave Plaintiff three (3) months to improve his performance or face termination.

42.     Concerned about his job, on or about August 16, 2013, Plaintiff sent an email to Woll asking for input and guidance on how he could improve his performance. Woll did not reply to Plaintiff's email.

*Woll Targets Plaintiff Based Upon His National Origin*

43.     As a result of the relocation, Plaintiff was segregated from his Haitian co-workers in an office in the Clinical Section of the Risk Management Department.

44.     Subsequent to Plaintiff's relocation, Woll held meetings with those co-workers in Plaintiff's former office, from which Plaintiff was regularly excluded.

45.     On or about April 17, 2013, at approximately 8:30 a.m., Plaintiff signed the regular attendance sheet located by Woll's office. Although Woll's office door was closed, Plaintiff heard Woll engage in a telephone conversation during which she said, **"I KNOW HOW TO GET RID OF THIS STUPID EGYPTIAN GUY."** The recipient of the discriminatory phone comment is currently unknown.

46.     On or about May 3, 2013, Plaintiff requested to leave work two hours early, so he could celebrate the Coptic Christian Good Friday holiday by attending services at his Church. At first Woll did not agree. Plaintiff then explained that had he gone to work 7:30 AM that day to attend the RCA meeting that was held at 8 AM, and by 3 PM he would have completed 7 hours required work day.

47.     Plaintiff also told Woll she should consider the one hour from 3-4 PM as his lunch hour.

48.     Woll continued to question Plaintiff about his religious practices, before finally approving his departure one and one-half (1 1/2) hours before normal. Plaintiff left work at 3:30 PM.

9

49.     On or about May 6, 2013, Woll again extensively questioned Plaintiff about the timing of his celebration of Coptic Easter, and other religious practices. Woll also asked Plaintiff which part of Egypt he came from, whether he was Arabic, and the differences between Arabs and Egyptians.

50.     Plaintiff explained Egyptians are the descendants of the Pharaohs, while Arabs immigrated to Egypt from Saudi Arabia. Plaintiff also explained he is a Coptic Christian and speaks both English and Arabic. At the end of the conversation, Woll said, "This is stupid."

51.     In or around the middle of July 2013, in front of Drs. Pierre and Belhomme and Mr. Lewis, all of whom are Haitian, Woll opined Plaintiff exhibited many cultural differences from the rest of the group.

52.     On or about August 13, 2013, Woll talked with the plaintiff about his ethnic origin and race. Once again on September 11, 2013, Woll without any legitimate purpose or interest engaged in a lengthy conversation with Plaintiff about his Egyptian heritage and the differences between Egyptians and Arabs.

*Defendants Unlawfully Terminate Plaintiff*

53.     On or about October 15, 2013, Woll called Plaintiff to a meeting with Berding, Emmons, and Murray. Woll presented Plaintiff with a performance evaluation dated September 25, 2013, in which she had given Plaintiff a performance rating of "U" – Unsatisfactory. Woll then terminated Plaintiff's employment.

54.     Plaintiff protested Woll's performance evaluation was fabricated and unwarranted. He also complained Woll had persecuted, harassed, humiliated and demeaned him. Was prejudiced against him, had discriminated against him and created a hostile work environment since she had become his supervisor. Woll did not respond to Plaintiff's complaint.

55.     Security escorted Plaintiff from the building.

56.     Defendants hired Dr. Romual Perard to replace Plaintiff. Upon information and belief, Dr. Perard is 31 years old and of Haitian descent.

57.     Since his unlawful termination, Plaintiff has applied for more than one hundred (100) jobs within HHC and has received neither interviews nor expressions of interest.

58.     Defendants' unlawful termination of Plaintiff has severely damaged Plaintiff's reputation. As a result, Plaintiff has not been able to find a job, within or out of Defendant's medical system, despite his excellent qualifications.

59.     As a result of Defendants' discrimination, Plaintiff has suffered severe psychological and emotional distress, which has caused Plaintiff to develop diabetes mellitus, uncontrollable hypertension, vitiligo of the scalp, persistent chest pain, as well as thyroid cysts and nodules. These have resulted in loss of Plaintiff's enjoyment of life and made him unable to engage with or support his family.

## FIRST CLAIM FOR RELIEF
## 42 U.S.C. §1981

60.     Plaintiff incorporates by reference, and repeats and re-alleges each and every allegation as if more fully set forth herein.

61.     Defendants have intentionally discriminated against Plaintiff in the terms, conditions, and privileges of his employment because of his race and ethnicity in that he was subjected to a hostile work environment and discharge.

62.     The individual Defendants directly participated in, aided, abetted, incited, compelled and coerced the aforementioned discriminatory treatment in violation of 42 U.S.C. §1981.

11

63.     As a proximate result of Defendants' discriminatory actions, Plaintiff suffered and continues to suffer substantial loss of earnings and other employment benefits.

64.     As a proximate result of Defendants' discriminatory actions, Plaintiff suffered and continues to suffer severe and lasting emotional distress, embarrassment, humiliation, and mental and physical anguish.

## SECOND CLAIM FOR RELIEF
### N.Y.C. Admin. Code § 8-107

65.     Plaintiff repeats and realleges each and every allegation as though set forth fully herein.

66.     By the acts and practices described above, Defendants discriminated against Plaintiff in the terms and conditions of his employment on the basis of his race, ethnicity, national origin and age in violation of the New York City Administrative Code.

67.     Defendants Natalie Woll and Robert Berding were responsible for, assisted, and failed to rectify the discrimination against Plaintiff.

68.     As a proximate result of Defendants' discriminatory actions, Plaintiff suffered and continues to suffer substantial loss of earnings and other employment benefits.

69.     As a proximate result of Defendants' discriminatory actions, Plaintiff suffered and continues to suffer severe and lasting emotional distress, embarrassment, humiliation, and mental and physical anguish.

70.     Defendants acted with malice and/or reckless indifference to Plaintiff's protected rights.

## JURY DEMAND

71.     Plaintiff demands a trial by jury of all issues in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1.      Accept jurisdiction over this matter.

2.      Order the Defendants to compensate Plaintiff for his past and future loss of wages and benefits, plus interest;

3.      Enter judgment in favor of Plaintiff for such amount as may be awarded by a jury for compensatory damages for his physical and emotional suffering and loss of enjoyment of life;

4.      Reinstate Plaintiff to the same position or to a position comparable to his former position or, in lieu of reinstatement, award him front pay (including benefits);

5.      Award Plaintiff all costs and reasonable attorneys' fees incurred in connection with this action; and

6.      Grant such additional or alternative relief as may appear to this Court to be just and equitable.


Dated: Farmingdale, New York
       January 2, 2015                  FRANK & ASSOCIATES, P.C.

                                 By:    _____
                                        Peter A. Romero, Esq.
                                        500 Bi-County Boulevard, Suite 112N
                                        Farmingdale, NY 11735
                                        (631) 756-0400

                                        *Attorneys for Plaintiff*

13