UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
NASHAAT MOZA

                Plaintiff,                    MEMORANDUM AND ORDER
                                                            15-CV-0051

    - against –

NEW YORK CITY HEALTH AND
HOSPITALS CORPORATION, KINGS
COUNTY HOSPITAL CENTER, ROBERT
BERDING and NATALIE WOLL

                Defendants.
-------------------------------------------------------x
GLASSER, Senior United States District Judge:

      Plaintiff Nashaat Moza ("Moza" or "Plaintiff") brings this action against defendants New York City Health and Hospitals Corp. ("HHC"), Kings County Hospital Center ("KCHC"), and individuals Robert Berding ("Berding") and Natalie Woll ("Woll"). Plaintiff alleges that he was unlawfully terminated from his employment at KCHC because of his race, ethnicity, national origin and age, and brings claims for relief under 42 U.S.C. §§ 1981 and 1983, and N.Y.C. Admin. Code § 8-107 ("NYCHRL"). Before the Court is Defendants' motion for summary judgment. For the reasons stated herein, the motion is GRANTED.

## BACKGROUND

      The following material facts, drawn from the parties' Local Civil Rule 56.1 Statements and evidentiary submissions, are undisputed unless otherwise noted.

1. <u>Overview of Plaintiff's Job at KCHC</u>

      Defendant HHC is a public corporation that operates New York City's municipal hospitals, including Defendant KCHC. ECF 28, Defendants' Local Rule 56.1 Statement of Undisputed Facts ("Def. Rule 56.1 St.") at ¶¶ 1, 2. Plaintiff Moza is of Egyptian national origin

and is a Coptic Christian. Id. at ¶ 7. He was born in 1952, and received his medical degree in Egypt. Id. In September 2008, Moza was hired by KCHC as an Assistant Director of Risk Management. Id. at ¶ 8. Three other employees shared Moza's position title, all of whom were of Haitian descent: Patrick Belhomme (52 years old), Lany Pierre (45 years old), and Sean Lewis (27 years old). ECF 33, Opp., at p. 2. In that role, Moza was responsible for reviewing cases for reportability to the state, which included reviewing medical records, identifying incidents and events that met certain state-mandated criteria, and preparing analyses and reports for review meetings (called Root Cause Analysis) and for submission to the New York State Division of Health. Id. at ¶¶ 12, 13.

2. Plaintiff's First Four Evaluations

Between the start of his employment in September 2008 and June 2012, Moza received four evaluations rating him as fully competent or better. During the first two years of his employment, Moza was evaluated for the periods ending on September 2, 2009 and September 2, 2010 by his supervisor, Paulette Bainbridge ("Bainbridge"). In each evaluation, Moza received an overall performance score of C, "fully competent," and in some competency categories, a score of E, "exceeds expectations." Id. at ¶¶ 15, 17; ECF 34, Plaintiff's Local Rule 56.1 Counterstatement ("Pl. Rule 56.1 St.") at ¶¶ 15, 17; see also ECF 29, Ex. L, 2009 Eval.; ECF 29, Ex. M, 2010 Eval. In January 2011, Isabel McFarlane ("McFarlane") replaced Bainbridge as Moza's supervisor. Def. Rule 56.1 St. at ¶ 18. McFarlane was born in 1960, and her husband is also of Egyptian national origin and a Coptic Christian. Id. at ¶ 19. McFarlane evaluated Moza on July 11, 2011 and gave him an overall performance score of S, "superior," for the six month period between January and July 2011. Id. at ¶ 20; see also ECF 29, Ex. N, 2011 Eval. McFarlane evaluated Moza again for the period ending on June 30, 2012 and gave him an overall

performance score of E, "exceeds expectations." Def. Rule 56.1 St. at ¶ 21; see also ECF 29, Ex. O, 2012 Eval.

3. Late-2012 Changes in the Risk Management Department

Towards the end of 2012, the Risk Management department experienced management changes. First, KCHC temporarily reorganized its reporting structure, and McFarlane began reporting to Defendant Robert Berding ("Berding"), the hospital's Associate Executive Director. Def. Rule 56.1 St. at ¶ 22. Berding was born in 1953, one year after Moza. Id. at ¶ 23. Around the same time, McFarlane announced she was changing roles at the hospital, which would leave a vacancy in her position as Senior Associate Director of Risk Management. Id. at ¶ 24. A job opening was posted on KCHC's website stating a preference for an applicant who was both a nurse and a lawyer. Id. at ¶¶ 24, 29; ECF 29, Ex. P, Job Posting. In December 2012, Moza, who is not a lawyer, applied for the position but was not offered the job. Def. Rule 56.1 St. at ¶¶ 25, 27. Instead, Defendant Natalie Woll ("Woll"), who is a nurse and a lawyer, was hired to replace McFarlane and become Moza's new supervisor, beginning in March 2013. Id. at ¶¶ 31, 32.

4. February 2013 Evaluation

Plaintiff claims that McFarlane's behavior towards him began to change in late 2012. Def. Rule 56.1 St. at ¶ 33. He attributes this change either to the fact that he applied for her job or because Berding did not like him and influenced McFarlane's opinion of him. Id. at ¶ 34. McFarlane, however, testified that a specific event significantly influenced her impression of Moza. Around February 2013, Moza completed a report of an incident at the hospital that was reviewed at a Root Cause Analysis meeting. Id. at ¶ 35. Following the meeting, McFarlane discovered that Moza had omitted critical facts from his report, requiring a second Root Cause Analysis meeting. Id. McFarlane testified that this was the "first time that a case had to be taken

3

again to Root Cause," and that Moza's mistake was "very significant." Id. Moza, however, contends that he excluded the pertinent information from the report under McFarlane's direction. Pl. Rule 56.1 St. at ¶ 36. After he fixed the report, Moza testified that McFarlane shamed him in front of his colleagues by insinuating he lacked computer skills. Id. at ¶ 37.

In anticipation of her departure, McFarlane evaluated Moza for the period between July 1, 2012 and February 28, 2013. Although she had evaluated Moza favorably in the past, she gave him an overall performance score of NI, "needs improvement," on that evaluation. Id. at ¶ 38; Def. Rule 56.1 St. at ¶ 38. In the evaluation, McFarlane summarized the circumstances of Moza's deficient report, and stated that Plaintiff "[f]ailed to recognize key events in the hospital course which impacted the analysis of case," that he arrived late to meetings and missed deadlines, and that he struggled with teamwork and accepting criticism. Id. at ¶ 39; see also ECF 29, Ex. R, Feb. 2013 Eval.

Moza disputes the circumstances surrounding that evaluation. He contends that on February 22, 2013, McFarlane asked him to sign a blank evaluation form. Pl. Rule 56.1 St. at ¶ 38. Sometime later, Moza says, Berding told him that McFarlane had evaluated Moza negatively but refused to show him the evaluation. Id. at ¶ 38. The February 2013 Evaluation itself is revealing. The evaluation contains signatures of McFarlane, Berding and Moza. McFarlane's signature is dated February 28, 2013, and Berding and Moza's are dated May 14, 2013. ECF 29, Ex. R., Feb. 2013 Eval. Additionally, the evaluation contains a handwritten note from Berding dated May 14, 2013 which states that he reviewed that evaluation with Moza in March at which time Moza was "encouraged to improve performance under new director," but that "employee has continued to submit unacceptable work products and disregard instructions of the new director." Id.; see also Def. Rule 56.1 St. at ¶ 62.

5. <u>Woll Becomes Plaintiff's Supervisor in March 2013</u>

Woll, who is of Russian descent and was born in 1969, succeeded McFarlane in March 2013. Id. at ¶¶ 41, 42. Moza contends that Woll did not like him from the start and discriminated against him because he is Egyptian. Id. at ¶ 43; Pl. Rule 56.1 St. at ¶ 43. He identifies a number of incidents that, he says, are indicative of Woll's dislike of him. For example, Woll asked Moza to sit in the back of the room with his colleagues during Root Cause Analysis meetings, as opposed to sitting near the front to take notes as he had done in the past, and told him that she should be the one to speak on behalf of the Risk Management Department, not him. Id. at ¶ 45. Additionally, Moza says that Woll attempted to erode his relationships with co-workers, and that in response, he confronted Woll in front of his co-workers and asked each of them if they had a problem with him. Id. at ¶ 64; Def. Rule 56.1 St. at ¶ 64.

Plaintiff also identified incidents during which he alleges Woll singled him out based on his being Egyptian. On April 17, 2013, Moza says he heard someone he believed to be Woll state "I know how to terminate this stupid Egyptian guy." Pl. Rule 56.1 St. at ¶¶ 43, 59. On May 3, 2013, Moza requested to leave work early to celebrate the Coptic Christian Good Friday. Def. Rule 56.1 St. at ¶ 54. In response, Woll asked Moza about Coptic Christianity, asked him to send her an email regarding the request, and then approved his request to leave early. Id. at ¶¶ 55-56. Moza claims Woll questioned him for ten minutes and that no one else was questioned about their religion. Pl. Rule 56.1 St. at ¶ 55. Woll also asked Moza about his religion when he returned from the Coptic Christian Easter holiday, and another time while he was discussing his medical studies in Egypt. Def. Rule 56.1 St. at ¶ 57. At the end of one conversation, Woll stated "this is stupid." Id. Finally, during a meeting, Woll told a Haitian employee that Moza had a

"different culture from us." Id. at ¶ 58; Pl. Rule 56.1 St. at ¶ 58. Neither Woll, nor anyone else, made any comments about Moza's age. Def. Rule 56.1 St. at ¶ 60.

    6. Moza's Continuing Performance Issues

On April 3, 2013 and April 11, 2013, Moza met with various managers, including Berding, Woll, and representatives from the human resources department, to discuss the concerns about his performance that McFarlane had identified in her February 2013 evaluation. Def. Rule 56.1 St. at ¶¶ 46, 47. Following these meetings, Woll created a Performance Improvement Plan ("PIP") to address Moza's performance issues and instructed him to switch offices with another colleague to "accommodate his request for a quieter work environment."[1] Id. at ¶¶ 49, 50; ECF 29, Ex. T, PIP. Woll testified that all of Moza's co-workers also received PIPs. ECF 29, Ex. C, Woll Dep., at 56:5-7; see also Pl. Rule 56.1 St. at ¶ 51. Moza's PIP enumerated various expectations related to tracking and managing Moza's work, communicating with Woll, and improving written work product by, for example, requiring Moza to spell-check his reports and review them for grammar and "logical flow." Def. Rule 56.1 St. at ¶¶ 51-53. Woll also removed certain cases from Moza's portfolio to accommodate his request to reduce his workload. Id. at ¶ 53. Conversely, Moza says that Woll replaced his substantive work with clerical administrative tasks that a secretary would normally complete, that were inappropriate for a doctor, and to which his peers were not assigned. Pl. Rule 56.1 St. at ¶ 53.

Moza's performance did not improve. See e.g. ECF 29, Ex. R, Feb. 2013 Eval., handwritten note from Berding, supra. Woll evaluated Plaintiff on June 30, 2013 and gave him an overall performance score of NI, "needs improvement." Def. Rule 56.1 St. at ¶ 65; see also

---

[1] Moza had complained about his colleagues who "communicat[ed] in a different language in a loud voice" in the office he shared with them. Def. Rule 56.1 St. at ¶ 48.

6

ECF 29, Ex. U, June 2013 Eval.  Among other things, her comments on the evaluation state that Moza was "uncooperative during the transition to new management," was "unwilling or unable to adapt to new requirements," "has made negative remarks about colleagues," submitted poor quality work that needed multiple revisions, and refused to participate in discussion of work product.  Def. Rule 56.1 St. at ¶ 66.

In July 2013, the reporting structure in the Risk Management Department changed again.  Ghassan Jamaleddine ("Jamaleddine") became the permanent Chief Medical Officer and assumed responsibility over the Risk Management Department, replacing Berding in that role.  Id. at ¶¶ 71, 74.  Jamaleddine is of Lebanese descent and was born in 1961.  Id. at ¶¶ 72, 73.  Jamaleddine testified that Moza would bring up irrelevant issues during Root Cause Analysis meetings, and said that he was surprised to learn Moza had a medical degree because his performance "was not at the level expected of a physician," and "his engagement with questions were like off-track."  Id. at ¶ 77.

7. Moza's Employment is Terminated

Woll evaluated Moza again on September 30, 2013, gave him an overall performance score of U, "unsatisfactory," and recommended his termination.  Id. at ¶¶ 79, 82; see also ECF 29, Ex. W, Sept. 2013 Eval.  Woll provided the following summary in the evaluation:

> Due to consistently poor analytical, writing and oral communication skills, this employee requires a high level of supervision which this department cannot afford.  Despite coaching, this employee has failed to show satisfactory improvement.  Performance is unsatisfactory.

Id.  On October 15, 2013, Woll and representatives from the human resources department gave Moza his September 2013 evaluation and terminated his employment.  Id. at ¶ 83.  KCHC replaced Moza with Dr. Romual Perard, who is of Haitian descent and was 30 years old, born in 1983.  Id. at ¶ 93.

7

## PROCEDURAL BACKGROUND

On October 23, 2013, Plaintiff initiated a proceeding with the New York City Commission on Human Rights ("CCHR") against KCHC, Woll and Berding, claiming discrimination on the basis of race. Id. at ¶ 94. He made no allegation as to age discrimination. Id. The CCHR determined that Moza "did not present a discrimination claim" under the NYCHRL, noting that Moza could not articulate a link between the incidents with Woll and his national origin, and that "merely asking questions about a person's country of origin by itself is not discrimination." Id. at ¶¶ 96, 97.

On September 30, 2014, Plaintiff filed a complaint with the New York State Division of Human Rights claiming that Woll and Berding discriminated against him based on his race, age, and "because he applied for the position of Senior Associate Director of Risk Management." Id. at ¶ 98. On October 8, 2014, Plaintiff filed a new complaint with the CCHR, this time alleging discrimination on the basis of national origin and age. Id. at ¶ 100. All of those complaints were voluntarily dismissed so Plaintiff could pursue his claims in federal court. Id. at ¶¶ 99, 101. He commenced this action on January 1, 2015. ECF 1.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. § 56(a). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 720 (2d Cir. 2010) (citations and quotation omitted). "A fact is material if it might affect the outcome of the suit under the governing law." Id. In deciding a motion for summary judgment, the court must "construe the facts in the light most favorable to the nonmoving party" and

8

"resolve all ambiguities and draw all reasonable inferences against the movant." Brod v. Omya, Inc., 653 F.3d 156, 164 (2d Cir. 2011) (quotation omitted). "Summary judgment is appropriate even in discrimination cases," Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (internal quotes omitted), and trial courts should not "treat discrimination differently from other ultimate questions of fact." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 524 (1993) (citation omitted).

## FEDERAL LAW CLAIMS

Plaintiff alleges that Defendants violated his federal rights under 42 U.S.C. § 1981[2] by discriminating against him on the basis of his race and ethnicity.[3] In discrimination cases under sections 1981 and 1983, the Court applies the basic framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); see also Hudson v. Int'l Bus. Machs. Corp., 620 F.2d 351, 354 (2d Cir. 1980) (applying that framework to § 1981 discrimination claims). Under that test, the initial burden is on the plaintiff to present a *prima facie* case of discrimination. McDonnell Douglas, 411 U.S. at 802. Once the plaintiff has made this showing, the burden shifts to the defendant to put forth some legitimate, non-discriminatory justification for the challenged action. Id. at 802–03. The burden then shifts back to the plaintiff

---

[2] Defendants ask the Court to dismiss this case on procedural grounds because 42 U.S.C. § 1983 is the exclusive remedy when the defendant is a state actor or individual sued in his official capacity, but the Complaint pleads a cause of action only under 42 U.S.C. § 1981. ECF 30, Memo. of Law, at p. 4. Because summary judgment is granted on substantive grounds, the Court need not address this argument.

[3] Plaintiff alleges discrimination on the basis of his national origin and age only in conjunction with this state law claims. Complt. at ¶ 66. Indeed, it is "settled that Section 1981 does not prohibit discrimination on the basis of . . . national origin . . . or age." Anderson v. Conboy, 156 F.3d 167, 170 (2d Cir. 1998) (collecting cases). Plaintiff has also withdrawn his hostile work place claim that is pled in the complaint. ECF 33, Opp., at p. 1 n.1.

9

to demonstrate that the defendant's proffered reason is pretextual. Id. at 804. Although the moving party bears the burden, a motion for summary judgment cannot be defeated "by offering purely conclusory allegations of discrimination, absent any concrete particulars." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985).

1. Plaintiff Has Established a *Prima Facie* Case

To establish a *prima facie* case of discrimination, Plaintiff must show that: (1) he is a member of a protected class; (2) he is qualified for the position; (3) he suffered an adverse employment action; and (4) circumstances surrounding that action give rise to an inference of discrimination. Fleming v. MaxMara USA, Inc., 371 F. App'x 115, 117 (2d Cir. 2010). Plaintiff's burden at this stage is *de minimis*. Weinstock, 224 F.3d at 42. Defendants concede that Plaintiff has satisfied all but the fourth element of his *prima facie* case, and argue only that the circumstances of his termination do not give rise to an inference of discrimination.

Moza alleges that Defendants preferred Haitian employees, and in fact, Moza was the only non-Haitian with his position title. ECF 35-1, Moza Dep., at 161:19-25. Moza, a person of Egyptian descent, was replaced by Perard, a person of Haitian descent. "[T]he mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the *prima facie* stage." Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir.2001); see also Littlejohn v. City of N.Y., 795 F.3d 297, 312-13 (2d Cir. 2015). On that basis alone, the Court finds an inference of discrimination and holds that Moza has established his *prima facie* case.

2. Defendants Had a Legitimate, Non-Discriminatory Basis for Terminating Moza

Once a *prima facie* case is established, the burden shifts to Defendants to demonstrate a legitimate, non-discriminatory basis for the adverse employment action. The employer's "burden of production is [] not a demanding one," as it need only offer a non-discriminatory explanation

for the employment decision.  Bickerstaff v. Vassar Coll., 196 F.3d 435, 446 (2d Cir. 1999). Here, Defendants have met that burden by alleging that Moza was terminated for poor performance.  See e.g. Phillip v. City of N.Y., No. 09 CIV. 442, 2012 WL 1356604, at *8 (E.D.N.Y. Apr. 19, 2012).

    3.  Plaintiff Has Not Shown That Defendants' Proffered Reason Is Pretextual

Because Defendants have proffered a non-discriminatory reason for Moza's termination, any presumption of discrimination ends and Plaintiff bears the burden of showing by a preponderance of the evidence that Defendants' proffered reason for the adverse action is a pretext for discrimination.  Back v. Hastings On Hudson Union Free Sch. Dist., 365 F.3d 107, 123 (2d Cir. 2004).  Plaintiff must demonstrate "*both* that the reason was false, *and* that discrimination was the real reason." St. Mary's Honor Ctr., 509 U.S. at 515; see also Weinstock, 224 F.3d at 42 ("To get to the jury it is not enough . . . to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination.").  The analysis "becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." Id.  Indeed, "[o]nly where an employer's business decision is so implausible as to call into question its genuineness should this Court conclude that a reasonable trier of fact could find that it is pretextual." Fleming, 371 F. App'x at 118.

Here, there is ample undisputed evidence that Defendants terminated Moza because of his poor performance.  Moza's deteriorating performance was well-documented in three evaluations that identified the same problematic behaviors—lateness, poor work product, refusal to accept criticism and poor relationship with co-workers—and in testimony from McFarlane, Woll, Berding and Jamaleddine.  Defendants attempted, continuously over many months, to help Moza improve his performance by conducting meetings and creating a PIP specifically tailored

11

to Moza's stated needs and his supervisor's feedback. This uniformity in feedback and consistency in action from named Defendants, and others, shows that "plaintiff's unsatisfactory ratings were based on defendants' (and others') legitimate perception" of Moza's performance and were not pretextual. Sotomayor v. City of N.Y., 862 F. Supp. 2d 226, 259 (E.D.N.Y. 2012), aff'd, 713 F.3d 163 (2d Cir. 2013).

Moza argues that there are "inconsistencies and implausibilities [sic]" in Defendants' explanation which do indicate pretext. ECF 33, Opp., at pp. 20-21. Primarily, he takes issue with the February 2013 evaluation which he says was completed under "suspicious circumstances," namely that he was asked to sign a blank evaluation form and that it was the first negative review he received in four years. Id. While his signature on the February 2013 evaluation, which is dated May 14, 2013, suggests otherwise, even if Moza signed a blank evaluation form, that does not indicate pretext. Instead, the evidence indicates that McFarlane, who is not a defendant, evaluated his performance honestly. There is nothing to suggest that she was motivated by a discriminatory animus, nor does Moza allege as much. If anything, the fact that McFarlane evaluated Moza favorably in the past corroborates her testimony that Moza's poor performance was the true reason for his negative evaluation, and not some other invidious motive. Ko Sheng Chuang v. T.W. Wang Inc., 647 F.Supp.2d 221, 233 (E.D.N.Y. 2009) ("It is difficult to impute bias against a plaintiff in a protected class where the person making the adverse employment decision also made a recent favorable employment decision regarding the plaintiff."); see also Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir.1997). Indeed, "prior good evaluations of the plaintiff's work performance alone [cannot] establish that later unsatisfactory evaluations are pretext for unlawful discrimination." Ticali v. Roman Catholic Diocese of Brooklyn, 41 F. Supp. 2d 249, 263 (E.D.N.Y.) (citations omitted), aff'd, 201 F.3d 432

(2d Cir. 1999). The fact that Plaintiff simply disagrees "with defendants over whether [his] behavior was inappropriate does not show that their stated reasons for terminating [him] were not their true reasons." Fleming, 371 F. App'x at 117.

As for whether there is an inference of discrimination, the only instances implicating potential discrimination involve Woll, and thus her behavior warrants additional consideration.[4] First, Woll questioned Moza about Coptic Christianity on a handful of occasions. While she said "this is stupid" at the end of one such conversation, there is no evidence that she took adverse action against Moza following, or because of, those conversations, nor is there evidence that she was offensive or mean-spirited in other respects. Indeed, the law "does not make employers liable for being mean or petty; it makes them liable for discriminating, for firing people or subjecting them to adverse employment determinations on account of their being a member of a protected class." Ticali, 41 F. Supp. 2d at 263. Moza argues that being subjected to questions about his religion alone was discriminatory. This cannot be so. Employers are not categorically prohibited from conversing with an employee about religion or national origin, and to hold otherwise would produce absurd results.

---

[4] Plaintiff argues that the Court should infer discrimination because similarly situated, non-Egyptian employees were not terminated. ECF 33, Opp. at pp. 18-19. Plaintiff may prove discrimination by showing that Defendants treated similarly situated employees outside of Plaintiff's protected group more favorably than they treated Plaintiff. "An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct." Ruiz v. Cty of Rockland, 609 F.3d 486, 493-94 (2d Cir. 2010). The "standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases." Id. (citing Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000). Plaintiff offers no evidence about his co-workers other than their names, ages and the fact they are of Haitian descent. While all of them received PIPs, there is no evidence of what those PIPs contained or to what standards they were held. Notably, there is no evidence that they exhibited the same performance issues as Plaintiff. Without sufficient evidence to that effect, Defendants are not liable for discrimination under a comparator theory.

13

As for Woll's alleged statement, "I know how to get rid of that stupid Egyptian guy," there is no evidence in the record about that comment, as neither Moza nor Woll testified to it in their depositions. Without evidence and context regarding that statement, the Court has no basis to believe that Woll actually made that comment or that it was related to Moza, much less that it shows a discriminatory motive that resulted in his termination. Phillip, 2012 WL 1356604 at *9 (stray remarks do not establish pretext when they are remote in time and unrelated to the challenged conduct). Similarly, Woll's comment about Moza's "different culture" is a "stray remark[] [] insufficient to show pretext." Sotomayor, 862 F. Supp. 2d at 260. The Court cannot infer a discriminatory animus from those statements alone, much less one that is tied to Moza's termination months later.

While Moza may disagree with Defendants' assessment of him, he "can point to no evidence in the record indicating that [his] employer was not, in fact, displeased with [his] actions, much less that the real reason for [his] termination" was because he is Egyptian. Soderberg v. Gunther Int'l, Inc., 124 F. App'x 30, 32 (2d Cir. 2005). The record is devoid of evidence sufficient to support a finding that Moza was terminated because of his race or ethnicity, and therefore summary judgment is warranted on the sections 1981 and 1983 claim.

## NEW YORK CITY LAW CLAIMS

Plaintiff alleges discrimination on the basis of his race, ethnicity, national origin and age under N.Y.C. Admin. Code ("NYCHRL") § 8-107. While Plaintiff's discrimination claim under the NYCHRL is subject to the same McDonnell Douglas burden-shifting analysis, NYCHRL claims must be considered separately from federal and state law discrimination claims. Vargas v. Morgan Stanley, 438 F. App'x 7, 10 (2d Cir 2011); see also Spiegel v. Schulmann, 604 F.3d 72, 80 (2d Cir. 2010). The NYCHRL is broader than the equivalent federal statutes. See Margherita

14

v. FedEx Exp., No. 07 Civ. 4826, 2011 WL 5024577, at *8 (E.D.N.Y. Oct, 20, 2011) (vacated on other grounds).  Nonetheless, "a plaintiff must still link the adverse employment action to a discriminatory motivation," and where he fails to do so, plaintiff's claims fail.  Sotomayor, 862 F. Supp. 2d at 258.  For the reasons discussed above, Plaintiff has not established a link between his termination and a discriminatory motive.  In his NYCHRL claim, Plaintiff also alleges discrimination on the basis of age and national origin.  There is simply no evidence that Plaintiff was treated differently because of any protected class of which he is a part.  Rather, the evidence strongly supports the finding that Plaintiff was terminated solely because of his poor performance, as already discussed above.  Plaintiff's NYCHRL claim cannot survive.

## CONCLUSION

For the reasons stated herein, Defendants' motion for summary judgment is granted.

SO ORDERED.

Dated:      Brooklyn, New York
            April 4, 2017

                                        /s/
                                        I. Leo Glasser

15